IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

DENISE J. DENBY,

                Plaintiff,

        v.

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

                Defendant.

Case No. 1:15-cv-00191-SB

**OPINION AND ORDER**

_____

**BECKERMAN, Magistrate Judge.**

      Denise J. Denby appeals the Commissioner of Social Security's ("Commissioner") final decision denying her application for Disability Insurance Benefits ("DIB") under Title II and Supplemental Security Income Benefits ("SSI") under Title XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 401-434 and 1381-1383f. The Court has jurisdiction to hear this appeal pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). For the reasons explained below, the Court reverses the Commissioner's decision and remands this case for payment of benefits.

Page 1 - OPINION AND ORDER

## BACKGROUND

**A.      Procedural History**

On January 13, 2011, Denby protectively filed applications for DIB and SSI, alleging disability beginning May 5, 2005,[1] due to cervical degenerative joint disease with mild to moderate disc narrowing from C4-5 to C6-7, mixed bipolar depressive disorder, generalized anxiety disorder, panic/anxiety disorder, post-traumatic stress disorder ("PTSD"), pain disorder associated with psychological factors and a general medical condition, borderline personality disorder, alcohol dependence in full, sustained remission since September 2009 (with the exception of a six-week relapse in late 2012), and polysubstance abuse in full, sustained remission since 2009. After the Commissioner denied her application initially and upon reconsideration, Denby filed a written request for a hearing before an administrative law judge ("ALJ"). On February 5, 2013, Denby, represented by counsel, appeared and testified before an ALJ. However, the hearing was continued so that additional evidence could be reviewed by the impartial medical expert. Subsequently, on July 25, 2013, again represented by counsel, Denby testified telephonically at a supplemental hearing. A vocational expert ("VE") also testified (by telephone) at the hearing.

On August 8, 2013, the ALJ issued a decision finding Denby not disabled, as defined by the Act. Denby filed a request for review of the ALJ's decision. On December 4, 2014, the Appeals Council denied Denby's request for review, making the ALJ's decision the Commissioner's final decision. 20 C.F.R. §§ 404.981, 422.210. Denby timely filed this appeal.

///

---

[1] Subsequently, Denby amended her onset date to January 1, 2010. (Tr. 17, 39, 85.)

**B.      Factual History**

Denby was 46 years old on the amended onset date of her disability. Denby earned a high school equivalency degree and attended college classes for two years. (Tr. 328.)[2] Denby has past relevant work as an administrative clerk, receptionist, hostess and waitress. Denby stopped working after she was fired by her employer. (Tr. 44, 46.)

**C.      The ALJ's Decision**

The ALJ applied the five-step disability evaluation process. 20 C.F.R. § 404.1520. *See Lester v. Chater,* 81 F.3d 821, 828 n.5 (9th Cir. 1995) (describing the five-step process). At step one, the ALJ found Denby had not engaged in substantial gainful activity since January 1, 2010, the amended onset date. (Tr. 19.) At step two, the ALJ determined Denby suffered from a number of severe impairments, including cervical degenerative joint disease with mild to moderate disc narrowing from C4-5 to C6-7, mixed bipolar depressive disorder, generalized anxiety disorder, panic/anxiety disorder, PTSD, pain disorder associated with psychological factors and a general medical condition, borderline personality disorder, alcohol dependence in full, sustained remission since September 2009 (with the exception of a six-week relapse in late 2012), and polysubstance abuse in full, sustained remission since 2009. (Tr. 20.) The ALJ concluded that Denby was not presumed disabled at step three, because her condition did not meet or equal any of the listed impairments. 20 C.F.R., Pt. 4, Subpt. P, App. 1. (Tr. 20-23.) The ALJ then assessed Denby's residual functional capacity ("RFC"), and applied this RFC assessment at steps four and five. *See* 20 C.F.R. § 404.1520(4) ("Before we go from step three to step four, we assess your residual functional capacity. . . . We use

---

[2]   "Tr." refers to the official transcript of the administrative record. (ECF No. 13.)

this residual functional capacity assessment at both step four and step five when we evaluate your claim at these steps.").

The ALJ found that Denby retained the RFC:

[T]o perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) except she is limited to occasional bilateral overhead reaching; she should never climb ladders, ropes, or scaffolds; she should avoid even moderate exposure to unprotected heights; she would be limited to simple, routine tasks; she should have no more than brief, superficial interaction with the general public; and she should not perform tasks requiring cooperative endeavors with co-workers.

(Tr. 23.) Although the ALJ recognized that Denby's testimony regarding additional limitations would establish a lower RFC, she rejected her subjective testimony as "not entirely credible" because, among other things, "the objective medical evidence does not fully support the level of limitation claimed." (Tr. 24.)

On the basis of this RFC assessment and the VE testimony at step four, the ALJ found Denby was unable to perform her past relevant work. The ALJ also determined that Denby's transferability of job skills was not material to the disability determination. Under the Medical-Vocational Rules, Denby was not disabled whether or not she had transferable job skills. (Tr. 28.) At step five, the ALJ determined Denby was not disabled because she retained the capacity to perform other work that existed in sufficient numbers in the national economy. In making this determination, the ALJ posed a hypothetical question to the VE based upon Denby's RFC. In response, the VE testified that a person with the specified RFC could perform occupations such as "Assembler, Production . . . ; Packing Line Workers . . .; and Cleaner, Housekeeping . . . ." (Tr. 28-29.)

///

///

Page 4 - OPINION AND ORDER

## II. STANDARD OF REVIEW

A district court reviews the Commissioner's decision to ensure that the Commissioner applied proper legal standards and that the ALJ's findings are supported by substantial evidence in the record. 42 U.S.C. § 405(g); *Bray v. Comm'r of Soc. Sec. Admin.,* 554 F.3d 1219, 1222 (9th Cir. 2009). "'Substantial evidence' means more than a mere scintilla, but less than a preponderance; it is such relevant evidence as a reasonable person might accept as adequate to support a conclusion." *Lingenfelter v. Astrue,* 504 F.3d 1028, 1035 (9th Cir. 2007). The Commissioner's decision must be upheld if it is a rational interpretation of the evidence, even if there are other possible rational interpretations. *Magallanes v. Bowen,* 881 F.2d 747, 750 (9th Cir. 1989). The reviewing court may not substitute its judgment for that of the Commissioner, *Robbins v. Soc. Sec. Admin.,* 466 F.3d 880, 882 (9th Cir. 2006), or "give vent to feelings of compassion." *Winans v. Bowen,* 853 F.2d 643, 655 (9th Cir. 1987).

## III. DISCUSSION

Denby argues that this case should be remanded for an award of benefits because the ALJ failed to: (1) credit the opinion of Michael F. O'Connell, Ph.D, an examining psychologist, (2) give clear and convincing reasons for rejecting Denby's testimony, (3) consider the combined effect of Denby's multiple impairments (severe and non-severe), and (4) meet her burden to show Denby retained the ability to perform other work in the national economy. (Pl.'s Brief 5-6.) As set forth below, the Court finds the ALJ's assessment of the medical source evidence, and her adverse credibility finding with respect to Denby's testimony, are not supported by substantial evidence. As a result, the Court remands this case for payment of benefits.

### A.    ALJ's Evaluation of the Medical Source Evidence

Denby argues on appeal that the ALJ failed to provide legally sufficient reasons for her decision not to credit the opinion of Dr. O'Connell, an examining psychologist, who concluded that Denby is unable to seek and maintain competitive work because she has marked limitations interacting with the public, supervisors, and coworkers, as well as marked limitations in responding to work situations. (Pl.'s Brief 23; Pl.'s Reply Brief 12.) In addition, Denby contends the ALJ failed to provide legally sufficient reasons to disregard the Global Assessment of Function ("GAF") scores assessed by the other source opinions. (Pl.'s Brief 26; Pl.'s Reply Brief 19-20.) The Court finds that the ALJ failed to provide clear and convincing reasons, supported by substantial evidence in the record, for not crediting Dr. O'Connell's opinion.

### 1.    Legal Standard

To establish a physical or mental impairment, a claimant must provide evidence from medical sources. Acceptable medical sources include licensed psychologists. 20 C.F.R. § 404.1513(a). Further, there are three types of physician opinions: (1) those who treat the claimant ("treating physician"), (2) those who examine but do not treat the claimant ("examining physician"), and (3) those who neither examine nor treat the claimant, but review the claimant's medical records ("nonexamining physician"). 20 C.F.R. § 404.1527(d); *Holohan v. Massanari,* 246 F.3d 1195, 1201-02 (9th Cir. 2001). Regardless of the type of physician opinion proffered, the ALJ is never relieved of her obligation to consider evidence submitted by each source, and to provide a reason for rejecting evidence. *See* 20 C.F.R. § 404.1527(d) ("Regardless of its source, we will evaluate every medical opinion we receive.").

Generally, the ALJ ascribes more weight to a treating physician's opinion than to the opinions of non-treating physicians. *Holohan,* 246 F.3d at 1201-02; *Lester,* 81 F.3d at 830. The ALJ may not reject the uncontroverted opinion or ultimate conclusions of a treating physician (or examining physician) without providing "clear and convincing" reasons supported by substantial evidence in the record. *Lester,* 81 F.3d at 830-31. "The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Magallanes,* 881 F.2d at 750 (quotations and citation omitted). The ALJ may, however, reject contradicted medical opinions by providing "specific and legitimate reasons," supported by substantial evidence. *Bayliss v. Barnhardt*, 427 F.3d 1211, 1216 (9th Cir. 2003).

Physicians' assistants, nurse practitioners, and therapists are defined as "other sources," and are thus entitled to less deference.[3] 20 C.F.R. §404.1513(d); Social Security Regulation ("SSR") 06-03p; *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012) ("The ALJ may discount testimony from these 'other sources' if the ALJ gives reasons germane to each witness for doing so." (citations and

---

[3]    The record also includes reports from Shelby M. Sanford, a Psychiatric-Mental Health Clinical Nurse Specialist. "CNS programs were the first nursing specialty to require graduate level preparation, and thus served as a model for excellence in advanced practice nursing education." Stacey B. Rose et al., *Role Preservation of the Clinical Nurse Specialist and the Nurse Practitioner*, Internet Scientific Publications, http://http://ispub.com/IJANP/5/2/741 (last visited March 7, 2016). Both CNSs and nurse practitioners are considered advanced practice nurses, and both must be able to "assess, diagnos[e], prescribe therapy, and maintain accountability." *Id*. Additionally, they must be skilled at effective communication, critical thinking, decision-making, critical and accurate assessment, and the ability to evaluate client responses and create appropriate interventions. *Id*.

Because 20 C.F.R. §§ 404.1513(d) and SSR 06-03p contain a nonexclusive list of "other sources," and expressly include nurse practitioners, the Court concludes that a CNS is properly included as an "other source" for purposes of the regulations and SSR 06–03p.

quotations omitted)). Moreover, the ALJ may reject the opinions of "other" medical sources if they are unsupported by treatment notes or objective findings. *See Blodgett v. Comm'r*, 534 Fed. Appx. 608, 610-11 (9th Cir. 2013) (affirming the ALJ's decision to accord little weight to "other" medical sources because their opinions were inconsistent with the treatment record).

### 2.    Medical Source Evidence[4]

With respect to Denby's assertions that the ALJ improperly discounted the medical source evidence, the Court turns first to Dr. O'Connell's March 13, 2013 assessment. Disability Determination Services referred Denby to Dr. O'Connell for a consultative examination. (Tr. 783.) Although Dr. O'Connell was an examining physician, he completed the most extensive and contemporary record review of all the medical source opinions cited by the ALJ. Specifically, in formulating his assessment of Denby, Dr. O'Connell considered records from eighteen office visits by Denby to the La Clinica Del Valle, dating June 16, 2011, through January 2, 2013. (Tr. 769.) Additionally, Dr. O'Connell reviewed records from the Emergency Department at Three Rivers Community Hospital spanning a three-year time period from August 15, 2009, through November 5, 2012. (Tr. 759.) Dr. O'Connell also conducted an independent examination of Denby, and he completed a Medical Source Statement of Ability to do Work-Related Activities (Mental). (Tr. 769-781.)

---

[4] The ALJ found that Denby had not engaged in substantial gainful activity since January 1, 2010, the amended onset date for disability. Accordingly, this Court considers only whether there is substantial evidence in the record to support the ALJ's finding that Denby has not been under a disability, as defined by the Act, from January 1, 2010, through the date of the ALJ's written decision, August 8, 2013. The ALJ did not consider medical evidence pre-dating these relevant time periods, and the Court will not rely on that earlier evidence in review of the ALJ's disability decision.

Page 8 - OPINION AND ORDER

Dr. O'Connell diagnosed Denby with generalized anxiety disorder, PTSD, pain disorder, and alcohol, opioid, and polysubstance dependence, all in remission. (Tr. 777.) Dr. O'Connell concluded:

> Based on the available evidence, one would conclude that Denise is capable of understanding and remembering basic workplace instructions. Mental Status Examination suggests that her ability to concentrate is well-maintained, *though this could fluctuate should she experience elevated levels of anxiety*. Pace is satisfactory, though Denise reports significant problems with persistence. For a number of years, she has struggled to maintain sobriety and return to the abuse of alcohol, recreational drugs or pharmaceuticals would result in a very significant reduction in her functional capacity. The *borderline elements in this woman's personality style predict she will have difficulty in maintaining the emotional stability necessary to sustain employment for the long haul*. Further, these personality elements will likely have a significant, negative impact on her ability to demonstrate appropriate social interaction in work environments, particularly as it relates to receiving and coping with potentially negative feedback about job performance.

(Tr. 777 (emphasis added).)

Dr. O'Connell concluded that Denby's impairments resulted in marked limitations in interacting appropriately with the public; marked limitations in interacting appropriately with supervisors; marked limitations in interacting appropriately with coworkers; and marked limitations in responding appropriately to usual work situations and to changes in a routine work setting. (Tr. 780.) In reaching his conclusion that Denby was unable to sustain full-time work, Dr. O'Connell noted that, in the past twenty-five years, Denby estimated approximately ten different employers, with her last employment ending by termination in November 2012. In fact, over the course of Denby's work history, she was fired nine or ten times. (Tr. 771.) In the years immediately prior to her disability termination, Denby was seen in the emergency department on four occasions for "suicidal concerns." In addition, Denby was committed as an inpatient three times between 2009 and

///

2012, to the Crisis Resolution Center ("CRC") for Options of Southern Oregon Mental Health ("Options"). (Tr. 773-774.)

Denby also relies on the medical evidence from Options. On February 8, 2011, a counselor at Options, Shelby A. Sanford (PMHCNS), completed a Psychiatric Evaluation of Denby. (Tr. 561-564.) Sanford's diagnostic impressions were anxiety disorder not otherwise specified ("NOS"), depression NOS, opioid dependence in remission, anxiolytic dependence in early remission, and personality disorder NOS. Sanford assigned Denby a GAF score of 46.

On November 5, 2012, Janet Eoff, M.D., an emergency department physician at Three Rivers Medical Center, transferred Denby to the CRC at Options after Denby arrived at the emergency department "feeling like she has no reason for being here and had considered jumping in front of a truck." (Tr. 653.) Prior to transfer, Dr. Eoff ordered a suicide risk assessment for Denby and the assessment revealed that Denby was at high risk. (Tr. 673.) Dr. Eoff diagnosed Denby with depression, suicidal thoughts, and chronic mental illness. (Tr. 654.)

On Denby's arrival at Options CRC, Nancy Ross (MSW, QMHP, LCSW, PCI) conducted a Provisional Assessment for increased anxiety and depression. Ross diagnosed Denby with major depressive disorder, recurrent generalized anxiety disorder, opioid/alcohol dependence in remission, and a GAF score of 40. (Tr. 871-873.) Denby was admitted to Options CRC that day, November 5, 2012, and discharged six weeks later, on December 17, 2012, following treatment for alcohol dependence, including a period of detoxification and titration of benzodiazepine. (Tr. 881.)

On February 13, 2013, Shane Bonella (LPC, QMHP), a counselor at Options, completed a comprehensive assessment and evaluation of Denby. Bonella diagnosed Denby with generalized

anxiety disorder, panic disorder without agoraphobia, PTSD, alcohol dependence, opioid dependence, major depressive disorder, bipolar disorder, manic (by history), and a GAF score of 48. (Tr. 788.) Bonella opined that Denby may benefit from "Supportive Employment and/or Supportive Education." (Tr. 788.)

On March 19, 2013, Sara Wubben (MSW, QMPH), another Options counselor, conducted a Psychiatric Evaluation Update on Denby. In accordance with all of Denby's previous medical sources, Wubben diagnosed Denby with, among other things, anxiety disorder NOS, depression NOS, anxiolytic dependence in early remission, alcohol dependence in early fragile remission, opioid dependence in full remission, amphetamine dependence in full sustained remission, personality disorder NOS, and a GAF score of 57. (Tr. 971-972.) Wubben opined that Denby "may benefit from the services Employment Works to identify, obtain and maintain employment." (Tr. 972.)

Two non-examining state agency psychologists, Bill Hennings, Ph.D., and Joshua Boyd, Psy.D., reviewed Denby's records for a disability determination. (Tr. 106-118, 123-135.) Dr. Hennings reviewed Denby's records through April 2011. (Tr. 107-109.) In addition, Dr. Hennings considered evidence of Denby's work history, her activities of daily living, and a third-party function report submitted by Denby's boyfriend, Kermit Robinson. (Tr. 107-108.) In July 2011, Dr. Boyd reviewed the same evidence sources as Dr. Hennings, and the recent records from Options and La Clinica Del Valle, which were subsequent to Dr. Hennings' review. (Tr. 125.)

Dr. Hennings and Dr. Boyd each completed a Mental Residual Functional Capacity ("MRFC") assessment for Denby. While both doctors opined that Denby had "sustained concentration and persistence limitations" and "social interaction limitations," they independently

concluded that Denby was "[n]ot significantly limited" in her "ability to complete a normal workday and workweek . . . ." (Tr. 114-115, 131.) Specifically, Drs. Hennings and Boyd opined that Denby could carry out and maintain concentration and persistence for one to two-step tasks, but would be unable to maintain concentration for more complex tasks due to her anxiety symptoms. (Tr. 115, 131.) Drs. Hennings and Boyd also opined that Denby was capable of appropriate co-worker and supervisor interaction, but could not tolerate greater than occasional general public contact. (Tr. 115, 132.)

### 3.    Analysis

The ALJ rejected Dr. O'Connell's ultimate conclusion that Denby was unable to work, on four grounds. First, the ALJ stated that she "does not assign significant weight to Dr. O'Connell's conclusion as it appears to be based on [Denby's] subjective reports more than his objective findings." (Tr. 22.) Next, the ALJ concluded that "the claimant has significant social limitations that reduce her overall functional capacity, but her continued ability to perform activities of daily living and work full or part-time during the relevant time period indicates that her social limitations would not entirely preclude her from working." (Tr. 26.) Third, the ALJ also noted that Denby's "counselors offered several opportunities for work experiences, indicating that they believed her capable of work. None of the counseling records or records overall include an opinion from an accepted medical source that the claimant would be unable to work because of her impairments." (Tr. 26.) Finally, the ALJ gave "great weight" to the opinions of Drs. Hennings and Boyd, who concluded that Denby could perform simple, routine tasks, and that she was "capable of appropriate co-worker and supervisor interaction." (Tr. 26-27.) The Court will consider each of the grounds

relied upon by the ALJ to determine whether there is substantial evidence in the record to support the ALJ's decision to reject Dr. O'Connell's conclusion that Denby is unable to work.

With respect to the ALJ's decision to afford less weight to Dr. O'Connell's conclusion because Dr. O'Connell relied upon Denby's subjective reports over objective findings, the Ninth Circuit rejected this same reasoning in *Ryan v. Commissioner of Social Security*, 528 F.3d 1194 (9th Cir. 2008). In *Ryan,* the Ninth Circuit held that an ALJ may not reject an examining physician's opinion by questioning the credibility of the patient's complaints, "where the doctor does not discredit those complaints and supports his ultimate opinion with his own observations." *Id*. at 1199-2000; *see also Edlund v. Massanari*, 253 F.3d 1152, 1159 (9th Cir. 2001) ("In sum, the ALJ appears to have relied on her doubts about [the claimant's] overall credibility to reject the entirety of [the examining psychologist's] report, including portions that [the psychologist] deemed to be reliable."). There is nothing in the record to suggest that Dr. O'Connell disbelieved Denby's description of her symptoms, or that Dr. O'Connell relied on those descriptions more heavily than his own clinical observations in reaching the conclusion that Denby was incapable of maintaining a regular work schedule. *See Regennitter v. Comm'r Soc. Sec. Admin.*, 166 F.3d 1294, 1300 (9th Cir. 1999) (finding that substantial evidence did not support ALJ's finding that examining psychologists took claimant's "statements at face value" where psychologists' reports did not contain "any indication that [the claimant] was malingering or deceptive").

The medical opinion that the court in *Ryan* required the agency to credit is indistinguishable from Dr. O'Connell's report here. Similar to the examining psychiatrist in *Ryan*, Dr. O'Connell expressed no doubts about Denby's credibility. *Ryan*, 528 F.3d at 1200. Furthermore, Dr. O'Connell

supported his ultimate opinion with his own independent clinical observations, similar to the doctor in *Ryan*. For example, the examining physician in *Ryan* remarked on the claimant's "rapid speech." *Id*. at 1199. Dr. O'Connell noted that Denby's speech was "slow in rate, but of normal cadence." (Tr. 776.) The physician in *Ryan* reported that the claimant's affect was "anxious, distraught, nervous, shaky, and edgy." *Id*. Dr. O'Connell recorded that Denby "appeared quite anxious, fidgeting, tapping her leg, rubbing her face and neck, and generally appearing physically restless." (Tr. 776.)

In addition, Dr. O'Connell performed an independent assessment of Denby, including administering mental status examinations. Dr. O'Connell's findings regarding Denby's marked limitations for functioning in a work setting was premised on his own observations and clinical judgment, including events documented in the medical record such as Denby's history of debilitating anxiety and suicidal ideation. In fact, Dr. O'Connell's assessment comports with the ALJ's finding that Denby suffered, among other things, the severe impairments of mixed bipolar depressive disorder, panic/anxiety disorder, PTSD, and borderline personality disorder. At the conclusion of his report, Dr. O'Connell noted that "[t]he results of the current assessment appear consistent with other information reviewed as part of this evaluation." (Tr. 777.)

In sum, Dr. O'Connell's findings correlate with both Denby's reported medical history and the medical records in evidence. In light of these similarities to the facts in *Ryan*, this Court finds that the ALJ's doubts about Denby's credibility were not sufficient to discredit Dr. O'Connell's conclusions. *Id*. at 1199-2000 (holding that the ALJ's doubt about a claimant's credibility cannot constitute a "clear and convincing" or "specific and legitimate" reason to discount an examining

///

physician's opinion where the physician expresses no doubt about the claimant's complaints and supports his conclusions with his own observations).

With respect to the ALJ's decision to afford less weight to Dr. O'Connell's conclusion because Denby could perform activities of daily living and worked part-time during the relevant time period, the evidence of record is that Denby was fired from her job due to her severe mental impairments. In addition, a finding that Denby is able to perform some work, complete some household chores, and independently attend to personal hygiene does not necessarily translate to the ability to perform full-time work, as defined by the Act. *See Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989) ("[M]any home activities are not easily transferable to what may be the more grueling environment of the workplace, where it might be impossible to periodically rest or take medication.").

The Ninth Circuit has specified "the two grounds for using daily activities to form the basis of an adverse credibility determination: (1) whether or not they contradict the claimant's other testimony and (2) whether or not the activities of daily living meet "the threshold for transferable work skills." *Orn v. Astrue*, 495 F.3d 625, 639 (9th Cir. 2007). The ALJ "must make specific findings relating to the daily activities and their transferability to conclude that a claimant's daily activities warrant an adverse credibility determination." *Id*. (quotations and citation omitted).

In *Fair*, the Ninth Circuit held that daily activities may be grounds for an adverse credibility finding "if a claimant is able to spend a substantial part of his day engaged in pursuits involving the performance of physical functions that are transferable to a work setting." 885 F.2d at 603 (emphasis omitted); *see also Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005) (stating that adverse

credibility finding based on activities may be proper "if a claimant engages in numerous daily activities involving skills that could be transferred to the workplace"). The ALJ must make "specific findings relating to [the daily] activities" and their transferability to conclude that a claimant's daily activities warrant an adverse credibility determination. *Burch*, 400 F.3d at 681.

The ALJ did not provide specific examples of how Denby's activities of daily living transferred to a competitive work environment, nor did the ALJ explain the inconsistencies between Denby's testimony and her activities of daily living. Specifically, the record shows that Denby's activities of daily living fall well below those of a "normal life." *Cf. Burch*, 400 F.3d at 680 (affirming an ALJ's rejection of a claimant's credibility in partial reliance on the claimant's daily activities of cooking, cleaning, shopping, interacting with others, and managing her own finances). The ALJ did not explain how Denby's modest participation in the activities of daily living transfer to the demands of a full-time work setting. *See id*. at 681 (an ALJ may consider daily living activities in the credibility analysis only where "a claimant engages in numerous daily activities involving skills that could be transferred to the workplace").

Denby reported to Dr. O'Connell that she watched television ten to twelve hours a day. This "activity" is so undemanding that it cannot be said to bear a meaningful relationship to the activities of the workplace. *See Fair*, 885 F.2d at 603 ("The Social Security Act does not require that claimants be utterly incapacitated to be eligible for benefits, and many home activities are not easily transferable to what may be the more grueling environment of the workplace, where it might be impossible to periodically rest or take medication." (citations omitted)). While Denby occasionally attends Alcoholics Anonymous ("AA") meetings, she contacts her sponsor by telephone. Denby

often avoids attending meetings in person because she fears that she will need to return home immediately. Denby reported to Dr. O'Connell that she prepares her own food and helps clean the kitchen, but she does no other household chores. (Tr. 776.) This testimony is consistent with Denby's hearing testimony. (Tr. 59-61.) There is not substantial evidence to support the conclusion that Denby is able to spend a substantial part of her day engaged in pursuits involving performance of functions that are transferable to a work setting. *See Vertigan v. Halter*, 260 F.3d 1044, 1049-50 (9th Cir. 2001) ("the mere fact that a plaintiff has carried on certain daily activities, such as grocery shopping, driving a car, or limited walking for exercise, does not in any way detract from her credibility as to her overall disability").

Next, with respect to the ALJ's reliance on the fact that Denby was working as a waitress during the period of alleged disability, the uncontroverted evidence is that Denby stopped working for reasons directly related to her disability (she was absent from work, and could not concentrate while at work, due to her anxiety and panic attacks). The record demonstrates that by 2010, Denby experienced mental health problems on such a significant level that she was terminated for absences and poor work performance. Thus, her mental health problems prevented her from successfully maintaining even part-time employment. *See, e.g., Webb v. Barnhart*, 433 F.3d 683, 688 (9th Cir. 1998) (finding that the fact claimant "sought employment suggests no more than that he was doing his utmost, in spite of his health, to support himself"); *see also Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998) ("Several courts, including this one, have recognized that disability claimants should not be penalized for attempting to lead normal lives in the face of their limitations."). The ALJ's

///

Page 17 - OPINION AND ORDER

finding that Denby is not precluded from work, due to her activities of daily living and her work history, is not supported by substantial evidence in the record.

With respect to the ALJ's decision to afford less weight to Dr. O'Connell's opinion because Denby's counselors believed her capable of work and no accepted medical source found that Denby is unable to work because of her impairments, that ground is contradicted directly by Dr. O'Connell, a medical source who concluded that Denby was unable to work due to marked limitations in her work-related function. Furthermore, in making this finding, the ALJ disregarded the counselors' qualifying statements about employment (i.e., "supportive employment"), and Denby's GAF scores as determined by those counselors.[5] Instead, the ALJ selectively relied upon qualified statements from two counselors, Bonella and Wubben, who opined that Denby "may benefit" from a work support source, without further explanation. Specifically, the ALJ stated that Denby's "counselors offered several opportunities for work experiences," yet the ALJ rejected the GAF scores provided by one of the counselors (Sanford) on the ground that the counselor was not an acceptable medical source, and because the counselor considered Denby's functioning in the context of an intake evaluation and not in consideration of the longitudinal evidence. (Tr. 25.) In addition, the ALJ failed to consider the opinions, including the GAF scores, of other counselors who treated Denby, including Ross, Bonella, and Wubben.

_____

[5] Although the fifth edition of the Diagnostic and Statistical Manual of Mental Disorders (issued May 27, 2013) abandoned the GAF scale in favor of standardized assessments for symptom severity, diagnostic severity, and disability (*see* Diagnostic and Statistical Manual of Mental Disorders V (DSM-V) 16 (5th ed. 2013)), at the time of Denby's assessments and the ALJ's opinion, the GAF scale was used to report a clinician's judgment of the patient's overall level of functioning on a scale of 1 to 100 (*see* Diagnostic and Statistical Manual of Mental Disorders IV (DSM-IV) 31-34 (4th ed. 2000)).

Under the applicable regulations, only licensed physicians and certain other qualified specialists are considered "[a]cceptable medical sources." 20 C.F.R. § 404.1513(a). Evidence of disability, however, may also be provided by "other sources." *Id*. at § 404.1513(d). "Other sources" include medical sources that are not "acceptable medical sources." *Id*. at § 404.1513(d)(1). These other medical sources include therapists. *Id*. Social Security Ruling ("SSR") 06-03p clarifies how the Social Security Administration considers opinions from sources who are not "acceptable medical sources." The ALJ can use other medical source opinions in determining the "severity of the individual's impairment(s) and how it affects the individual's ability to function." SSR 06-03p. As noted, SSR 06-03p states that the ALJ "generally should explain" the analysis of other source opinions.

Sanford (CNS), Ross (MSW), Bonella (LPC), and Wubben (MSW) are "other" medical sources because they are mental health counselors. *See* 20 C.F.R. § 404.1513(d)(1) (therapists are expressly included as "other sources"); *see also Evans v. Astrue*, No. 6:12-cv-00344-HZ, 2013 WL 2146450, at *6 (court recognizes LPC and MSW designations as other source therapists). The ALJ considered these other source assessments, but she does not explain her decision to rely selectively on their isolated comments about employment training and disregard the counselors' assessments, including the GAF scores. *See* SSR 06-03p, 2006 WL 2329939, at *6 ("[T]he adjudicator generally should explain the weight given to opinions from these 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case"). In fact, with the exception of Sanford, the ALJ's decision is silent as to the weight, if any,

she accorded the reports of the numerous Options mental health counselors. Furthermore, the ALJ's decision to disregard the GAF score assigned by Sanford on the ground it was not supported by longitudinal evidence is contrary to the evidence of record, namely, the record includes several low GAF scores from various providers over a number of years. The GAF score assigned to Denby by Sanford is consistent with the medical evidence and, thus, does not provide a germane reason for the ALJ to dismiss Sanford's assessment of Denby. *See Salazar v. Astrue*, 859 F. Supp. 2d 1202, 1224 (D. Or. 2012) ("When an ALJ discredits evidence from an 'other source,' the ALJ must provide 'specific reasons, germane to the witness,' for doing so." (quotation and citation omitted)).

The record includes numerous reported GAF scores for Denby, ranging from 33 to 70.[6] While GAF scores are not controlling and do not directly correlate to a finding of disability, they are relevant because they are "a rough estimate of an individual's psychological, social, and occupational

---

[6] The following GAF scores were reported by Denby's providers between January 1, 2010, and the date of the supplemental hearing: 52 on September 27, 2010, 38 on October 21, 2010, 33 on December 10, 2010, 45 on December 17, 2010, 46 on February 8, 2011, 40 on November 5, 2012, 48 on January 9, 2013, 57 on March 19, 2013, and 70 on March 19, 2013.

A GAF of 31-40 indicates some impairment in reality testing or communication (speech is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., avoiding friends, neglecting family, unable to work). A GAF of 41-50 indicates serious symptoms (suicidal ideation, severe obsessional rituals frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., few friends, unable to keep a job). A GAF of 51-60 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or coworkers). A GAF of 61-70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." Diagnostic and Statistical Manual of Mental Disorders IV (DSM-IV) 31-34 (4th ed. 2000).

functioning used to reflect the individual's need for treatment."[7] *Garrison v. Colvin*, 759 F.3d 995, 1002 n.4 (9th Cir. 2014) (noting that "GAF scores, standing alone, do not control determinations of whether a person's mental impairments rise to the level of a disability" but, "they may be a useful measurement"); *De Los Reyes v. Comm'r*, No. 1:12-cv-02048-AC, 2014 WL 61320, at *13 (D. Or. Jan. 7, 2014) ("GAF scores are relevant to assess a claimant's ability to work but they are not dispositive"). The fact that the GAF scores here are consistent, and rendered over a four-year period by a number of practitioners, suggests they were not inconsequential to the ultimate disability determination.

In sum, the ALJ erred in failing to assess and weigh the mental health practitioners' opinions, including their GAF scores, and by not providing reasons germane to each in disregarding the opinions. Indeed, the ALJ was silent with respect to the considerable evidence provided by the Options mental health counselors regarding Denby's significant impairments and limitations. As such, the ALJ's decision to select two qualified statements, among the many pages of reports submitted by those counselors, does not provide substantial evidence for the ALJ to discount Dr. O'Connell's report.

---

[7] The Commissioner argues that a GAF score is not probative in determining disability, as evidenced by the fact the American Psychiatric Association no longer endorses it. (Def.'s Brief 17.) While the Fifth Edition of the DSM dropped the GAF scale for "several reasons," including "its lack of conceptual clarity" and "questionable psychometrics in routine practice" (DSM-V 16), the scores in this case were issued in accordance with the then-applicable DSM-IV-R and, as explained above, they are therefore relevant to the disability analysis. *Skelton v. Comm'r of Soc. Sec.*, No. 6:13-cv-1117-HZ, 2014 WL 4162536, at *11 (D. Or. Aug. 18, 2014). Regardless, the Court is not holding that a GAF score is determinative of disability, but only that the ALJ failed to provide reasons germane to the opinions, including the GAF scores, of the other medical source opinions. *See* SSR 06-03p, at *6 (The ALJ must explain the weight assigned to "not acceptable" medical sources to the extent that a claimant or subsequent reviewer may follow the ALJ's reasoning.)

Finally, with respect to the ALJ's decision to credit the opinions of Drs. Hennings and Boyd

over Dr. O'Connell's opinion that Denby is unable to work, it is settled law that the opinion of a non-

examining medical source cannot by itself constitute substantial evidence that justifies the rejection

of the opinion of an examining physician. *Lester*, 81 F.3d at 831 ("The opinion of a nonexamining

physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion

of either an examining physician or a treating physician."). In addition, Drs. Hennings and Boyd

reviewed records of Denby's treatment only through April and July 2011, respectively. Neither of

those doctors considered medical source evidence after that date, including Dr. O'Connell's March

2013 assessment, and Denby's subsequent emergency department visits and in-patient treatment for

suicidal ideation. *See Osenbrock v. Apfel*, 240 F.3d 1157, 1165 (9th Cir. 2001) ("A treating

physician's most recent medical reports are highly probative."); *Young v. Heckler*, 803 F.2d 963, 968

(9th Cir.1986) ("Where a claimant's condition is progressively deteriorating, the most recent medical

report is the most probative."). Drs. Hennings' and Boyd's assessments of Denby are not supported

by the other medical evidence, and were based on incomplete records. As a result, the opinions of

those non-examining physicians do not provide substantial evidence for the ALJ to discount Dr.

O'Connell's opinion.

For all of the reasons discussed above, the Court finds that the reasons cited by the ALJ to

discredit Dr. O'Connell's opinion that Denby was unable to work are not supported by substantial

evidence in the record.

///

///

Page 22 - OPINION AND ORDER

**B.**    **Claimant's Credibility**

Denby argues that the ALJ failed to provide clear and convincing reasons for rejecting her hearing testimony. The Court finds that the reasons the ALJ provided to reject Denby's testimony are not supported by substantial evidence in the record.

**1.**    **Legal Standard**

The ALJ is required to engage in a two-step analysis to determine whether a claimant's testimony regarding subjective pain or symptoms is credible. *Lingenfelter*, 504 F.3d at 1035-36. First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment "which could reasonably be expected to produce the pain or other symptoms alleged." *Bunnell v. Sullivan,* 947 F.2d 341, 344 (9th Cir. 1991) (en banc) (internal quotation marks omitted). The claimant "need not show that her impairment could reasonably be expected to cause the severity of the symptom she has alleged; she need only show that it could reasonably have caused some degree of the symptom." *Smolen v. Chater,* 80 F.3d 1273, 1282 (9th Cir. 1996). "Thus, the ALJ may not reject subjective symptom testimony . . . simply because there is no showing that the impairment can reasonably produce the *degree* of symptom alleged." *Id*. (emphasis in original); *see also Reddick,* 157 F.3d at 722 ("[T]he Commissioner may not discredit the claimant's testimony as to the severity of symptoms merely because they are unsupported by objective medical evidence.").

If a claimant meets the first test, and there is no evidence of malingering, "the ALJ can reject the claimant's testimony only by offering specific, clear and convincing reasons for doing so." *Smolen,* 80 F.3d at 1281; *see also Carmickle v. Comm'r of the Soc. Sec. Admin.*, 533 F.3d 1155,

///

1160 (9th Cir. 2008) ("The only time this standard does not apply is when there is affirmative evidence the claimant is malingering.").

### 2.    Denby's Hearing Testimony

Denby testified that during 2012, she worked as a waitress one to two days per week for about six hours a day. Occasionally, her supervisor called her for additional work days. (Tr. 82.) In November 2012, Denby was unable to perform her job duties due to "horrible panic attacks at work" and she was terminated from her position. (Tr. 82.) Shortly after Denby was terminated from her job, she voluntarily entered treatment at CRC following an emergency room visit for suicidal ideation. (Tr. 42, 83.) Denby testified that she presently attends weekly AA meetings. (Tr. 42.)

Denby explained that her November 2012 relapse was an effort to find relief from the anxiety and panic attacks, rather than an urge to drink. (Tr. 43.) Typically, Denby's panic attacks start before she leaves her home. Denby testified that the symptoms of those attacks include "shaking very bad," becoming "nauseous," and "often [she will] throw up two or three times before [she] leave[s.]" (Tr. 43-44.) In addition, Denby testified that "by the time I leave, I'm already a nervous wreck, and so that's when all the confusion starts, and I can't remember anything. I can't . . . food comes up from the window, and I can't remember where it goes." (Tr. 44.)

In reviewing her work history, Denby testified that although she returned to work in June 2010, six months later she "got fired for her anxiety issues." (Tr. 44.) At that time, Denby experienced daily panic attacks and she was unable to leave her house "most of the time." Denby did not attend AA meetings, and the days she did work "were horrific." (Tr. 45.) Denby testified that she would often take double or more the allotted "smoke breaks" each day just to "get away from the

people." (Tr. 48.) At work, Denby often felt desperate and was "constantly running to the women's room . . . and try to breathe for a moment." (Tr. 48.)

Denby testified that in 2010, she was not able to work full time in any capacity. She had limited ability to focus or stay alert, she had "a huge fear of people," and she was "a nervous wreck all the time[.]" Denby stated that she was anxious before going to work. Denby estimated that while at work she made mistakes with customer orders approximately half of the time. (Tr. 52-53.) Although Denby's supervisor was aware of her anxiety issues and attempted to work with her, at one point, her supervisor removed Denby from the schedule for a few weeks due to poor work performance. (Tr. 53.) Denby testified that in the event she worked full-time, she would call in sick more than three days per month due to her anxiety. (Tr. 54.) In fact, Denby pointed to a specific example of when she worked full time at a less demanding position and was terminated for calling in sick too often. (Tr. 55.)

Despite her termination in December 2010, Denby testified that she was able to return as a waitress in April of 2011. However, Denby adjusted her schedule to limit work to two days a week, six to eight hours per day, and she required extra breaks. (Tr. 49.) When she was not at work, Denby did not leave her house. Denby testified she "just would sit in front of the TV." (Tr. 50.)

With respect to her living situation, Denby testified that in 2010 she lived with her boyfriend for about six months, and then she began to rent a room from someone she knew from AA. (Tr. 50.) A year later, in June 2012, Denby rented a room from a different woman. (Tr. 50.) A few months later, Denby lost her job and was homeless. Denby was then admitted to CRC for a six-week

///

Page 25 - OPINION AND ORDER

inpatient treatment. (Tr. 51.) Following her December 2012 discharge from CRC, Denby moved in with a friend from AA. (Tr. 51.)

With respect to her activities of daily living, Denby testified that she drives "a little bit." Denby does not own a car and instead borrows her daughter's car as needed for appointments. (Tr. 55-56.) A couple of times per week, Denby walks to a nearby grocery store. (Tr. 56.) At times, Denby must cut short her trips to the store due to her anxiety. Denby is able to do some household chores such as dishwashing, but often she is unable to complete the task due to her anxiety. (Tr. 59.) Denby testified that she eats "already prepared" foods, and the owner's daughter cleans the house and does the yard work. (Tr. 60-61.) Due to her concerns about addiction, Denby uses only non-narcotic medications for her sleep and anxiety. Denby testified that she sleeps about twelve to thirteen hours per day. (Tr. 57.)

### 3. The ALJ's Credibility Assessment

At the first step of the credibility analysis, the ALJ determined that Denby's underlying medically determinable impairments could reasonably be expected to cause some of her alleged symptoms. (Tr. 24.) There was no evidence of malingering, and therefore the ALJ was required at the second step of the credibility analysis to provide clear and convincing reasons for rejecting Denby's testimony. *See Lingenfelter*, 504 F.3d at 1036 (holding that if a claimant establishes that her alleged impairment "could reasonably have caused some degree of the symptom" and there is no evidence of malingering, an ALJ must provide specific, clear, and convincing reasons to reject the testimony). Consequently, the Court must determine whether the ALJ provided specific, clear, and convincing reasons for her adverse credibility finding.

In assessing Denby's credibility, the ALJ concluded that "[t]he claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible . . . ." (Tr. 24.) The ALJ provided three reasons for this finding: the objective medical evidence, Denby's activities of daily living, and the fact she worked part time during the relevant time period. (Tr. 24-26.) The Court will consider each of the grounds relied upon by the ALJ to determine whether there is substantial evidence in the record to support the ALJ's adverse credibility finding with respect to Denby's testimony.

First, the ALJ determined Denby was not fully credible because "the objective medical evidence does not fully support the level of limitation claimed." (Tr. 24.) However, the ALJ may not make a negative credibility finding "solely because" the claimant's symptom testimony "is not substantiated affirmatively by objective medical evidence." *Robbins*, 466 F.3d at 883. Furthermore, in the Ninth Circuit, a claimant need only produce objective medical evidence of an impairment or impairments, and show that the impairment or combination of impairments could reasonably be expected to produce some degree of symptom. *Smolen,* 80 F.3d at 1282 (emphasis omitted). In *Smolen*, the Ninth Circuit held:

> The claimant need not produce objective medical evidence of the pain or fatigue itself, or the severity thereof. . . . Nor must the claimant produce objective medical evidence of the causal relationship between the medically determinable impairment and the symptom . . . . By requiring that the medical impairment 'could reasonably be expected to produce' pain or another symptom, the *Cotton* test requires only that the causal relationship be a reasonable inference, not a medically proven phenomenon . . . . Finally, the claimant need not show that her impairment could reasonably be expected to cause the severity of the symptom she has alleged; she need only show that it could reasonably have caused some degree of the symptom.

///

*Smolen,* 80 F.3d at 1282 (citations omitted). Finally, while the ALJ cited to portions of the medical record in support of her adverse credibility finding, she did not explain how that evidence conflicted with Denby's testimony. Simply citing to isolated excerpts in the record does not satisfy the ALJ's duty to provide clear and convincing reasons to discredit claimant's testimony. *See Garrison*, 759 F.3d at 1017 & n.23 (noting that ALJ may not cherry-pick from mixed results).

With respect to the objective medical evidence, there is no dispute that the medical record establishes that Denby suffered from severe mental impairments. In fact, the ALJ found that Denby's severe mental impairments included, among other things, mixed bipolar depressive disorder, generalized anxiety disorder, panic/anxiety disorder, PTSD, pain disorder associated with psychological factors and a general medical condition, and borderline personality disorder. The ALJ indicated that each of these also significantly limited Plaintiff's mental ability to perform basic work activities. 20 C.F.R. §§ 404.1520 (c) and 416.920 (c). A thorough review of the medical record reveals that the duration and extent of Denby's mental impairments are well established. *See* SSR 96-7p ("In general, a longitudinal medical record demonstrating an individual's attempts to seek medical treatment for pain or other symptoms and to follow that treatment once it is prescribed lends support to an individual's allegations of intense and persistent pain or other symptoms for the purposes of judging the credibility of the individual's statements.") Denby received mental health treatment for nearly a decade and her significant impairments persisted through the date of the hearing. Numerous providers consistently observed that Denby exhibits serious symptoms of mental illness or serious impairments in functioning. Denby's condition required at least three crisis inpatient stays, and her symptoms were managed with medication. The record also clearly shows that

as a result of her mental impairments, Denby is markedly restricted in her work-related functioning. Accordingly, the ALJ's finding that Denby's symptom testimony conflicted with the medical evidence is not supported by substantial evidence in the record.

The Court next considers the ALJ's finding that "despite her anxiety, the claimant was able to work and earned income equal to or greater than the presumptive amount of earnings for substantial gainful activity from June to December 2010." (Tr. 24.) This statement conflicts with the ALJ's earlier statement that Denby's work between June and December 2010 "was an unsuccessful work attempt" and "none of the claimant's work performed after January 1, 2010, rose to the level of substantial gainful activity." (Tr. 19; *see also* Tr. 85 (ALJ finds that in 2010, Denby was below the level of substantial gainful activity).) In addition, the ALJ did not cite to any evidence that Denby stopped working for reasons other than her impairments. Similarly, the ALJ did not explain how the fact that Denby was terminated from her employment due to her mental impairments and was not engaged in substantial gainful activity since her alleged onset date, conflicted with her testimony at the hearing. The undisputed evidence is that Denby worked a reduced schedule, required extra breaks and trips to the women's room, had a benevolent employer, and was nevertheless terminated (repeatedly) due to her mental impairments. (Tr. 48, 49, 52-53, and 54.) Accordingly, the ALJ's conclusion that Denby's part-time work in 2010 was a basis to reject her testimony is not supported by substantial evidence in the record.

With respect to Denby's activities of daily living, the ALJ relied on isolated areas of functioning as a basis to conclude Denby's activities of daily living provided a basis to discredit her testimony. For example, the ALJ relied on Denby's testimony that she does her own shopping, but

the ALJ did not include the limitation that Denby often is forced to cut short those trips due to her mental impairments. The ALJ also noted that there was evidence Denby went camping and rafting. (Tr. 27.) The fact that over a several year period of impairment, Denby managed to have periods of temporary well-being is not a valid basis to discredit her testimony. *See Holohan*, 246 F.3d at 1205 ("That a person who suffers from severe panic attacks, anxiety, and depression makes some improvement does not mean that the person's impairments no longer seriously affect her ability to function in a workplace."). Finally, the ALJ relied on those activities to discredit testimony about Denby's *physical* impairments, which are not relied upon by the Court in this decision. (Tr. 27.)

For all the reasons stated above, the Court finds that the three reasons cited by the ALJ for her adverse credibility finding are not supported by substantial evidence in the record.

## C.    Remedy

"[T]he Ninth Circuit has held that, in social security cases, where the ALJ improperly discredited either a claimant or a treating physician's testimony, that 'it would be an abuse of discretion for a district court not to remand for an award of benefits when [certain] conditions are met.'" *Aparicio v. Colvin*, ___ Fed. App'x ___ , 2015 WL 9461608, at *3 (9th Cir. Dec. 28, 2015) (quoting *Garrison*, 759 F.3d at 1020). Specifically, a district court should remand for an award of benefits when the following "credit-as-true" criteria are met:

> (1) the record has been fully developed and further administrative proceedings would serve no useful purpose; (2) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion; and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand.

///

*Id*. (quoting *Garrison*, 759 F.3d at 1020). Even if these criteria are met, however, "the court retains the 'flexibility' to remand for further proceedings where 'an evaluation of the record as a whole creates serious doubt that a claimant is, in fact, disabled.'" *Id*. (quoting *Garrison*, 759 F.3d at 1020).

In this case, there are no issues that could benefit from further development of the record. In response to a question based on Dr. O'Connell's opinion regarding Denby's functioning, including marked limitations in a work setting, the VE testified that Denby would not be able to maintain competitive employment. (Tr. 68.) If Dr. O'Connell's improperly discredited medical evidence is credited as true, the ALJ would be required to find Denby disabled on remand, because her marked limitations would prohibit competitive employment. (Tr. 68.)

In addition, in response to Denby's testimony regarding potential absenteeism, the VE testified that employers tolerate "one day of missed work per month, or 12 for the year, and that persistent and ongoing issues of missed or unplanned work would lead to termination of employment." (Tr. 66.) If Denby's improperly discredited testimony is credited as true, the ALJ would be required to find Denby disabled on remand, because missing work twice a month "would lead to termination of employment." (Tr. 66.)

The Court is unable to say that the record as a whole creates serious doubt about whether Denby is disabled, and therefore remand to the ALJ for a calculation and award of benefits is appropriate here.

///

///

///

Page 31 - OPINION AND ORDER

## IV. CONCLUSION

The Court REVERSES the Commissioner's decision and remands this case for an award of benefits.

IT IS SO ORDERED.

Dated this 8th day of March 2016.

_____
STACIE F. BECKERMAN
United States Magistrate Judge